IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-07-00251-CR

 

Edwin Kenner Lyon, Jr.,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 



From the 40th District Court

Ellis County, Texas

Trial Court No. 31647CR

 



MEMORANDUM  Opinion










 

            Edwin Kenner Lyon was convicted of
indecency with a child, a second degree felony.  He was sentenced to 20 years
in prison.  Because the evidence is both legally and factually sufficient to
support the conviction, the trial court’s judgment is affirmed.

            J.L., Lyon’s five-year-old granddaughter,
told her foster mother during a conversation about “stranger danger” that she
had been touched inappropriately.  She pointed to her vaginal area when telling
her foster mother about the touching.  After the allegation was reported to the
authorities, J.L. was interviewed by Teresa Evans at the Gingerbread House, Ellis County’s Child Advocacy Center.  J.L. told Evans that her “real dad’s dad” touched her
private, which she indicated on a drawing was her genitals, under her clothes. 
J.L. also told Evans that it happened at Lyon’s house in Waxahachie in his
bedroom while they watched television.  She said he touched her with a rubbing
motion on her skin.  At trial, although she was unable to provide details about
the event or the name of the person who touched her, J.L. identified Lyon as
the person who touched her, said that it happened more than once, and said that
no one other than Lyon had touched her.

            In a counseling session with Caroline
Von Helms, and while talking about a stuffed animal given to J.L., J.L. told
Helms about the interview she had gone to.  J.L. drew a doll on a white board
and started coloring in different parts of the doll, primarily the genitals. 
When asked what she was doing, J.L. responded that those were the areas where her
papa touched her.  When Helms stated that she did not know who her papa was,
J.L. explained that he was her father’s father.  When asked whether he touched
her above or below her clothes, she said “below.”  Helms further testified that
it was not unusual for children J.L.’s age to have a hard time remembering the
specifics of what happened because their memory has not developed fully and,
specifically with J.L., because she was no longer in the abusive environment
and had moved beyond it.  Helms also stated that it was not uncommon to have no
medical evidence of inappropriate touching.

            In two issues, Lyon argues that the
evidence was legally and factually insufficient to support his conviction
because there was no medical evidence of abuse, and because J.L. could not tell
the jury the name of the person who touched her, could not provide details
about the incident, and could not recall when or where the incident happened. 
He also argues that because the touching described was consistent with applying
medication to the genital area, a theory that was only mentioned in argument to
the jury, the evidence was legally and factually insufficient to prove intent
to arouse and gratify his sexual desire.  See Tex. Penal Code Ann. § 21.11(a), (c) (Vernon 2003).  

            A conviction for indecency with a
child is supportable on the uncorroborated testimony of the victim of the
sexual offense.  See Tex. Code
Crim. Proc. Ann. art. 38.07 (Vernon 2005).  The requisite specific
intent of the offense can be inferred from the defendant's conduct and remarks
and all the surrounding circumstances.  McKenzie v. State, 617 S.W.2d
211, 216 (Tex. Crim. App. [Panel Op.] 1981).  Additionally, the lack of
physical or medical evidence does not necessarily render the evidence
insufficient to support a conviction.  See Murphy v. State, 4 S.W.3d
926, 930 (Tex. App.—Waco 1999, pet. ref'd).  And further, there is no evidence
in this record that Lyon was in the process of applying medication to J.L. when
the incident occurred or that Lyon was a caregiver that would be responsible
for such activity.

            Viewing the evidence under the
appropriate standards of review, we find the evidence legally and factually
sufficient to support the conviction.  See Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); Castillo v.
State, 221 S.W.3d 689, 693 (Tex. Crim. App. 2007); Watson v. State,
204 S.W.3d 404, 415 (Tex. Crim. App. 2006).   Lyon’s issues are overruled.

 

 

            The trial court’s judgment is
affirmed.

 

                                                                        TOM
GRAY

                                                                        Chief
Justice

 

Before
Chief Justice Gray,

            Justice
Vance, and

            Justice
Reyna

Affirmed

Opinion
delivered and filed May 21, 2008

Do
not publish 

[CR25]






#160;    

O P I N I O N
                                                                                                    

      On August 4, 1986, Eugene Pribyla sold all of his shares in John F. Beasley Construction
Company to Williams Industries, Inc. under a stock purchase agreement that obligated Williams
Industries to "cause the coverage under Beasley's Health Insurance Policy in existence for the
benefit of Pribyla and his dependents to be continued at the expense of Beasley for a period of not
less than five years, after which period Pribyla and his dependents shall have the option of
continuing such coverage under such policy at his or their own expense." (Emphasis added). In
1991 Pribyla and his wife, Karen, sued Williams Industries and Beasley for breaching the
italicized portion of the agreement and obtained a joint and several judgment for $2.5 million and
$135,000 attorney's fees. A principal contention on appeal, as it was in the trial court, is that the
suit is preempted by ERISA and, for that reason, the trial court lacked jurisdiction.


 We will
reverse and render judgment that the Pribylas take nothing against Beasley and reform and affirm
the judgment against Williams Industries.
FACTUAL BACKGROUND
      Eugene Pribyla, an officer, director, and stockholder of Beasley, and other shareholders


 sold
all of their stock in the company to Williams Industries on August 4, 1986, leaving Williams
Industries as Beasley's sole shareholder. At the time of the sale, Beasley's employees and
executives were covered by a group medical policy issued by Connecticut General Life Insurance
Company (CIGNA), a policy that had been in effect since 1984. Pribyla was severely disabled
from a 1978 stroke and, for some time prior to the stock sale, had been receiving in-home nursing
care provided by private-duty nurses.
      The stock sale agreement contained the following provision:
8. Continuation of Health Insurance and Disability Benefits for Pribyla. Upon acquiring
control of Beasley by means hereof, [Williams Industries] shall cause the coverage under
Beasley's Health Insurance Policy in existence for the benefit of Pribyla and his dependents
to be continued at the expense of Beasley for a period of not less than five years, after which
period Pribyla and his dependents shall have the option of continuing such coverage under
such policy at his or their own expense. The Union Mutual Disability Policy currently in
effect for the benefit of Pribyla shall continue in effect with benefits accruing for the benefit
of and paid to Pribyla on the same basis as heretofore until such policy terminates upon
Pribyla attaining the age of 65.
      Beasley maintained the CIGNA policy in effect during the five-year period following the stock
sale, and the Pribylas remained covered by the policy at Beasley's expense. During this period,
as it had done for some time prior to the stock sale, CIGNA continued to reimburse Pribyla for
all of his nursing expenses.


 However, as the five-year period was drawing to a close, Beasley
and Williams Industries notified the Pribylas that they could continue their coverage under
Beasley's group policy at a premium cost of $284,000 a year or they could enroll in the Williams
Industries Employee Benefit Trust (Williams Trust), which provided medical coverage for all other
companies owned by Williams Industries.
      On October 24, 1991, the Pribylas sued Williams Industries and Beasley in the state district
court for breach of the insurance provision, alleging that they wanted to continue their coverage
under the CIGNA policy at their own expense but that Williams Industries had breached the
agreement by refusing to require Beasley to continue such coverage. If the CIGNA policy had
been continued the Pribylas' pro rata share of the group premium was estimated to be $17,400 a
year. They also sought (1) specific performance against Williams Industries of the insurance
provision, (2) an injunction requiring Beasley to continue the Pribylas' coverage under the CIGNA
policy, and (3) a declaratory judgment interpreting the insurance provision.



      Because they needed medical coverage, the Pribylas elected to enroll in the Williams Trust
on November 1, 1991, with the express understanding that they were not waiving their rights
under the insurance provision. Beasley did not renew the CIGNA policy for the policy year 1991-1992, and Beasley's employees and executives, who were formerly covered by the CIGNA policy,
thereafter received medical benefits through the Williams Trust.
      In January 1992 Pribyla submitted claims for reimbursement of his nursing expenses to
Prudential Insurance Company of America, which then provided the group medical coverage for
the Williams Trust, but Prudential denied the claims on the ground that the nursing services were
not medically necessary.


 He submitted another claim for reimbursement to Massachusetts Mutual
in January 1994, just prior to trial, but the claim was also denied. 
PROCEDURAL HISTORY
      Using competing motions for summary judgment as vehicles to obtain an interpretation of the
insurance provision, each side sought an interpretation that would benefit its interest. The court
denied the motion filed by Williams Industries and Beasley and granted the Pribylas' motion. In
its order ruling on the motions, the court interpreted the provision as follows: (1) the provision
"obligates [Williams Industries and Beasley] after a period of five years to offer [the Pribylas] the
option of continuing coverage under the . . . CIGNA policy (i.e., the policy in effect when the
Stock Purchase Agreement was executed), or an equivalent policy if the CIGNA policy is no
longer in effect"; and (2) the provision "obligates [Williams Industries and Beasley] to offer [the
Pribylas] the option described above at the Pribylas' expense which is to be an equal, pro rata
share of the company's premium, just like any other employee or family unit covered by such
policy would be or might be required to pay."
      Later, during a jury trial on liability and damages, the court included an instruction in the
charge on its interpretation of the provision. It also included an instruction setting forth the
limitations in the three group policies (i.e., CIGNA, Prudential, and Massachusetts Mutual) on
reimbursement of in-home nursing expenses. The jury found that both Williams Industries and
Beasley had breached the "continuation of health insurance" portion of the insurance provision and
awarded the Pribylas $2.5 million in damages. Based on the verdict, the court entered a joint and
several judgment against the defendants for the amount of damages found by the jury, plus
$135,000 attorney's fees stipulated by the parties.
EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA)
I.
GENERAL OVERVIEW
      ERISA comprehensively regulates employee welfare benefit plans that, through the purchase
of insurance or otherwise, provide medical, surgical, hospital care or benefits. 29 U.S.C.A. §
1002(1) (West Supp. Pamph. 1994). Without question, then, the medical benefits provided by
Beasley under the CIGNA policy, as well as the benefits provided by the Williams Trust through
the policies issued by Prudential and Massachusetts Mutual, constitute employee welfare benefit
plans.
      ERISA preemption is both express and implied. ERISA expressly preempts any and all state
laws, including common-law actions for breach of contract, that "relate to" any employee welfare
benefit plan. Id. § 1144(a) (West 1985); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct.
1549, 1553, 95 L.Ed.2d 39 (1987). ERISA also impliedly preempts any state action that conflicts
directly with an ERISA cause of action specified in section 1140. 29 U.S.C.A. § 1140 (West
1985) (Interference with protected rights); Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111
S.Ct. 478, 484-85, 112 L.Ed.2d 474 (1990). 
      Preemption, however, does not automatically divest a state court of jurisdiction. State and
federal courts have concurrent jurisdiction of civil actions by a plan participant or beneficiary (1)
to recover benefits due him under the terms of his plan, (2) to enforce his rights under the terms
of the plan, or (3) to clarify his rights to future benefits under the terms of the plan. 29 U.S.C.A.
§ 1132(a)(1)(B), (e)(1) (West 1985 & West Supp. Pamph. 1994). Jurisdiction of all other civil
actions brought by a plan participant or beneficiary is vested exclusively in the federal district
courts. Id. § 1132(e)(1) (West Supp. Pamph. 1994). Thus, if ERISA preempts a claim filed in
a state court with concurrent jurisdiction, the state court can exercise its jurisdiction, but in doing
so it must apply federal common law. [CITE].
      Williams Industries and Beasley first contend that the suit for breach of contract is expressly
preempted because it "relates to" a plan governed by ERISA or, alternatively, that it is impliedly
preempted because it conflicts directly with an ERISA cause of action specified in section 1140. 
They also argue, alternatively, that the trial court lacked jurisdiction because the suit does not fall
within section 1132(a)(1)(B) or, if the court had concurrent jurisdiction, then it erred when it failed
to apply federal common law during the trial. 
II.

 "PREEMPTION THICKET"
      The Fifth Circuit has aptly described the legal morass surrounding the question of ERISA
preemption as the "preemption thicket." Memorial Hosp. System v. Northbrook Life Ins. Co., 904
F.2d 236, 244 (5th Cir. 1990). The problem lies, of course, in determining when a state action
"relates to" an employee benefit plan.
      Congress intended the key words "relate to" to be given their "broad common-sense meaning,
such that a state law [or action] `relate[s] to' a benefit plan `in the normal sense of the phrase, if
it has a connection with or reference to such plan.'" Pilot Life Ins. Co., 107 S.Ct. at 1553 (citing
Metropolitan Life Ins. Co. v. Mass., 471 U.S. 722, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728
(1985)). Although the language of the preemption clause is "deliberatively expansive" and
"conspicuous for its breadth," it nevertheless has its recognized outer limits. Ingersoll-Rand, 111
S.Ct. at 482, 483. A state action, for example, may affect an employee benefit plan in "too
tenuous, remote or peripheral a manner to warrant a finding that the [action] `relates to' the plan." 
Shaw v. Delta Airlines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983). 
In fact, the United States Supreme Court has declined to draw a bright line between actions that
"relate to" a plan and those that are too tenuous, remote or peripheral to justify such a conclusion. 
Id. Twenty years after ERISA's adoption, litigants and courts alike continue to wrestle with the
"relate to" language and its effect on a state law or action.
III.
COMPETING CONTENTIONS
      Williams Industries and Beasley essentially contend that the contract action has a "connection
with" or "makes reference to," and thus "relates to," an ERISA plan because (1) the trial court had
to interpret the three group policies and compare their policies' level of benefits; (2) their liability
depends upon the impact of amendments to the health plan—i.e., the change in policies and
insurers; and (3) the contract action is based on the difference between the benefits promised in
the insurance provision and the benefits established by each health policy. They characterize the
suit as a complaint by "plan participants"—whose principal evidence is the three policies—that
their plan benefits had been reduced by the change in policies. See 29 U.S.C.A. § 1002(7) (West
Supp. Pamph. 1994) (defines "plan participant"). Another contention by Williams Industries and
Beasley is that the suit is impliedly preempted because it is nothing more than an action for
interference with the "attainment of rights" under the health plans, which conflicts with an ERISA
action. See id. § 1140 (West 1985).
      The Pribylas contend, however, that their contract action does not "relate to" the health plans,
which they concede are governed by ERISA, because it is for the breach of the stock sale
agreement. Their suit is not preempted, they argue, merely because the court had to refer to or
interpret the three policies. According to the Pribylas, any such reference to or connection with
the plans is too tenuous, remote or peripheral to justify preemption.
IV.
DOES ERISA PREEMPT THE PRIBYLAS' CLAIM?
      We will use the Fifth Circuit's two-factor test to narrow our preemption inquiry. See Hook
v. Morrison Milling Co., 38 F.3d 776, 781 (5th Cir. 1994) (citing Memorial Hosp. System, 904
F.2d at 245). First, does the suit for breach of contract address areas of exclusive federal concern,
such as the right to receive benefits under an ERISA plan? See id. Second, does the claim
directly affect the relationship among the principal ERISA entities (i.e., the employer, the plan and
its beneficiaries, and the participants and beneficiaries)? See id.
FIRST FACTOR
      As the Fifth Circuit recognized in Memorial Hosp. System, the congressional intent underlying
ERISA's preemption clause is to afford "employers the advantages of a uniform set of regulations
governing plan fiduciary responsibilities and governing procedures for processing claims and
paying benefits." Memorial Hosp. System, 904 F.2d at 245. Our initial inquiry will thus focus
on whether the suit for breach of the insurance provision implicates this regulatory or preemptive
scheme? See id. at 246.
      As part of the consideration for the purchase of Eugene Pribyla's stock in Beasley, Williams
Industries agreed to the terms of the insurance provision in the stock sale agreement. Obviously,
the court had to examine and interpret the provisions of the CIGNA policy to determine the extent
of Williams Industries' undertaking. Williams Industries and Beasley contend that the contract
action "relates to" an ERISA plan because the court was forced to interpret the CIGNA policy and
the replacement policies and compare their benefits. If referring to an ERISA plan for the purpose
of calculating damages will not provide a sufficient nexus to justify preemption, then we fail to
see how referring to a plan to determine the extent of Williams Industries' contractual obligation
will suffice as a nexus.


 See Rozzell v. Security Services, Inc., 38 F.3d 819, 822 (5th Cir. 1994);
Memorial Hosp. System, 904 F.2d at 247.
      Williams Industries obligated itself to allow the Pribylas, at their expense, to continue their
coverage under Beasley's group policy. The Pribylas sued for breach of this portion of the
agreement. The breach occurred, they alleged, when Williams Industries refused to allow them
to continue their coverage under Beasley's CIGNA policy, the policy in effect at the time of the
stock sale, at their pro rata share of the group premium and then terminated their coverage under
the policy. They measured their actual damages by the total amount of in-home nursing expenses
incurred from the date the CIGNA policy terminated to the time of trial, reduced by the total of
pro rata premiums they would have paid on the CIGNA policy during that period. Using this
same measure for calculating damages, the Pribylas also sued for future damages from the date
of trial. Using the CIGNA policy to calculate damages for breach of the insurance provision does
not provide a sufficient nexus to effect a preemption. See id.
      Neither CIGNA nor any other insurance carrier were made parties to the suit. While that fact
does not determine the question of preemption, it cannot be ignored. See [CITE]. Furthermore,
the Pribylas did not seek to recover benefits from any ERISA plan or allege that their claims for
reimbursement were improperly processed. Other than serving as a benchmark for determining
the scope of Williams Industries' promise and calculating damages, the terms of the CIGNA policy
were essentially irrelevant to the outcome of the suit. See Christopher v. Mobil Oil Corp., 950
F.2d 1209, 1220 (5th Cir. 1992); Memorial Hosp. System, 904 F.2d at 247. If Williams
Industries' underlying conduct is stripped of its sole link to Beasley's benefit plan—i.e., reference
to the plan for the purposes of determining the scope of Williams Industries' contractual obligation
and calculating damages—the suit would not cease to exist but would stand alone. Cf.
Christopher, 950 F.2d at 1220 (holding that underlying conduct could not be divorced from the
ERISA plan).
      Moreover, enforcing Williams Industries' obligation under the insurance provision will not
impede the congressional intent behind ERISA's preemption clause. See Memorial Hosp. System,
904 F.2d at 245. Regardless of whether the Pribylas recover, Williams Industries, Beasley, and
other employers will still be afforded the same advantages of uniform regulations governing the
procedures for processing claims, paying benefits, and the responsibilities of plan fiduciaries. Nor
will preempting the contract action, which would insulate Williams Industries from the legal
consequences flowing from its commercial dealings, further the congressional goal of "protecting
the interests of employees and their beneficiaries in employee benefit plans." See id. at 247. 
Finally, the one-time recovery of damages from Williams Industries for breach of the insurance
provision will not affect the ongoing administration or obligations of any ERISA plan. See id.
      Under these facts, the state action for breach of the insurance provision does not implicate the
regulatory or preemptive scheme underlying ERISA.
SECOND FACTOR
      Our next inquiry will focus on whether the contract action directly affects the relationship
between the principal ERISA entities. See id. at 245. Although the suit on its face appears to
involve plan participants (the Pribylas) and two plan sponsors (Williams Industries and Beasley),
in reality it centers on the breach of a contractual duty owed by a stock purchaser to a seller of
stock. The parties' dual relationships, although parallel, are independent under the facts
presented. See Sommers Drug Stores v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1468 (5th
Cir. 1986). The suit has nothing to do with their ERISA relationship but everything to do with
the breach of a duty owed by one to the other under a written agreement that is otherwise
irrelevant to any ERISA plan. Under the circumstances, their contractual agreement and the suit
for its breach does not implicate or affect their relationship as ERISA entities; rather, it affects
them in their separate capacities as contractual obligor and obligee. See id. For this reason, the
contract action does not directly affect the relationships among principal ERISA entities.
      For the reasons given, we also reject the alternative contention that ERISA impliedly preempts
the contract action. Standing alone, the suit is for recovery of damages arising from the breach
of the insurance provision, not an action for interference with the "attainment of rights" under an
ERISA plan. See 29 U.S.C.A. § 1140 (West 1985).
      Having applied the test used by the Fifth Circuit and finding both factors missing, we hold
that the Pribylas' claim for breach of contract is not preempted by ERISA and, for that reason,
conclude that the court had jurisdiction of the suit. Points one and two are overruled.
IS BEASLEY JOINTLY LIABLE? 
      Beasley moved for an instructed verdict on the ground that there was no evidence that it was
liable for a breach of the insurance provision. It contended that only Williams Industries (the
"Buyer" under the stock sale agreement) was obligated to carry out its terms. Beasley's third point
complains about the denial of the motion.
      The Pribylas first contend that Beasley waived this complaint when it did not file a verified
denial asserting that it was not liable in the capacity in which it was sued. See Tex. R. Civ. P.
93(2). "Capacity," as that term is used in Rule 93(2), refers to a party's standing to sue or be
sued; it does not relate to the merits of a claim or of a defense to a claim. Light v. Wilson, 663
S.W.2d 813, 814 (Tex. 1983). The Pribylas sued Beasley and Williams Industries as separate
legal entities, obtained a jury finding that both had breached the insurance provision, and received
a joint and several judgment. Under the circumstances, Beasley's standing to be sued was not in
issue, only its liability under the evidence presented against it. See id. Accordingly, Beasley was
not required to file a verified denial under Rule 93(2) and may, on the basis of its general denial,
challenge the proof of its liability in any capacity alleged. See id. (holding that the sole
shareholder of a defendant corporation could challenge the proof of his joint and several liability
even though he filed no verified denial under Rule 93). There was no waiver of Beasley's right
to challenge the legal sufficiency of the evidence supporting a finding of its liability.
      Relying on the opinion in Pledger v. Schoellkopf, 762 S.W.2d 145 (Tex. 1988), the Fort
Worth court of appeals reached a different conclusion on the application of Rule 93(2). Beacon
Nat. Ins. Co. v. Reynolds, 799 S.W.2d 390, 395 (Tex. App.—Fort Worth 1990, writ denied). 
The question in Pledger was whether the defendant had to file a verified denial before it could
complain on appeal that the cause of action sued on was not owned by the plaintiff; the Court held
that the complaint had to be raised by a verified denial. Pledger, 762 S.W.2d at 145-46. 
However, we view Pledger and Light as being consistent in their interpretations of Rule
93(2)—"capacity" (i.e., the standing of the plaintiff to sue on a claim owned by another) was at
issue in Pledger and, for that reason, a verified denial was required to raise the issue of the
plaintiff's standing to sue. See id. Because we interpret the holdings in both Light and Pledger
as consistent, we refuse to follow the holding in Beacon Nat. Ins. Co.
      Because the stock sale agreement designates Williams Industries as "Buyer" and lists Beasley
as one of the "Sellers,"


 the parties clearly intended the term "Buyer" to refer only to Williams
Industries, not to Beasley. Thus, only the "Buyer"—Williams Industries—is obligated to carry
out the insurance provision.
      Upon execution of the agreement, Beasley became a wholly-owned subsidiary of Williams
Industries. Frank Williams, the majority shareholder in Williams Industries, had served on
Beasley's board even before its acquisition and, after the stock sale, obviously continued to
influence the policies and actions of both companies. As a separate and distinct legal entity,
Beasley would not be liable for the acts or obligations of Williams Industries merely because it was
a wholly-owned subsidiary or because both companies were then under common management. 
See Harper v. Lott Town & Improvement Co., 228 S.W. 188, 194 (Tex. Comm'n App. 1921,
judgm't adopted); Robbins v. Houck, 251 S.W.2d 429, 432 (Tex. Civ. App.—Galveston 1952,
writ ref'd n.r.e.). Nor would common management, standing alone, establish any principal-agency relationship between the two companies. See Cosand v. Gray Wolfe Co., 262 S.W.2d 547,
548 (Tex. Civ. App.—Galveston 1953, no writ).
      However, the insurance provision obligated Williams Industries to "cause" Beasley, at its
expense, to continue the Pribylas' health coverage under Beasley's group policy for a five-year
period and then, inferentially, to "cause" Beasley to extend to the Pribylas the option of continuing
coverage at their own expense. Considering the plain language used, the parties to the stock sale
agreement clearly understood and intended for Williams Industries to act through its wholly-owned
subsidiary, Beasley. Thus, the agreement itself is evidence of an express agent-principal
relationship between Beasley and its parent corporation, at least as far as the insurance provision
is concerned.
      Because a portion of the stock sale agreement—the insurance provision—disclosed Williams
Industries as the principal, an inference arose that the insurance provision was the undertaking of
Williams Industries, the principal, and not that of Beasley, the agent. See Restatement
(Second) of Agency § 157 (1957). The Pribylas had the burden of showing that Beasley was
a party to the insurance provision, and they could overcome the inference that it was not a party
by proof that Beasley had made a promise to carry out its terms, other than as Williams Industries'
agent, or by proof of other facts connected with the transaction showing that Beasley had made
the obligation its own. See id. § 320 cmt. b, c. The record is devoid of any such proof, and the
court thus erred when it denied Beasley's motion for an instructed verdict. Consequently, we
sustain point three and, in our disposition, we will reverse and render a judgment that the Pribylas
take nothing against Beasley.
INTERPRETATION OF THE INSURANCE PROVISION
      Both sides sought an interpretation of the insurance provision through competing motions for
a summary judgment. The court granted the Pribylas' motion and denied that of the defendants. 
In its order ruling on the motions, the court interpreted the provision as follows:
(1) the provision "obligates [Williams Industries and Beasley] after a period of five years to
offer [the Pribylas] the option of continuing coverage under the . . . CIGNA policy (i.e., the
policy in effect when the Stock Purchase Agreement was executed), or an equivalent policy
if the CIGNA policy is no longer in effect"; and (2) the provision "obligates [Williams
Industries and Beasley] to offer [the Pribylas] the option described above at the Pribylas'
expense which is to be an equal, pro rata share of the company's premium, just like any other
employee or family unit covered by such policy would be or might be required to pay."
      Williams Industries complains in point four about what it considers to be the court's erroneous
rulings on the motions for summary judgment, which allegedly resulted in an incorrect
interpretation of the provision. Point five attacks the jury instruction containing the court's
allegedly erroneous interpretation. It argues in point six, alternatively, that the insurance
provision is ambiguous, which precluded summary judgment regarding its interpretation. We
group these points for discussion and disposition.
      Our point of departure is the language of the insurance provision:



8. Continuation of Health Insurance and Disability Benefits for Pribyla. Upon acquiring
control of Beasley by means hereof, [Williams Industries] shall cause the coverage under
Beasley's Health Insurance Policy in existence for the benefit of Pribyla and his dependents
to be continued at the expense of Beasley for a period of not less than five years, after which
period Pribyla and his dependents shall have the option of continuing such coverage under
such policy at his or their own expense. The Union Mutual Disability Policy currently in
effect for the benefit of Pribyla shall continue in effect with benefits accruing for the benefit
of and paid to Pribyla on the same basis as heretofore until such policy terminates upon
Pribyla attaining the age of 65.
      To ascertain the parties' intent, we will apply the well-settled rules governing the
interpretation of contracts set out in R & P Enterprises v. LaGuarta, Gavrel & Kirk, 596 S.W.2d
517, 518-19 (Tex. 1980). Briefly summarized, the following rules will guide us in our task. We
must determine their intent from the language used in the insurance provision. See id. at 518. 
Our interpretation must give meaning and effect to all of its terms. See id. at 519. If, after
applying these rules, the provision is reasonably susceptible to more than one meaning, then the
provision will be declared to be ambiguous. See id. Ambiguity is a question of law. Id. at 518.
       This portion of the insurance provision is at the heart of the parties' dispute: "[Williams
Industries] shall cause the coverage under Beasley's Health Insurance Policy in existence for the
benefit of Pribyla and his dependents to be continued . . . ." Reduced to its essence, Williams
Industries' basic contention is that the parties intended the language to be a generic reference to
"whatever health insurance policy may be in effect for employees of Beasley at any given time." 
Williams Industries argues that the parties intended the phrase, "Beasley's Health Insurance Policy
in existence," to refer to whatever policy Beasley had in effect at any time. To reach that
conclusion, however, Williams Industries disconnects the words "in existence" from the remainder
of the phrase they obviously relate to, "for the benefit of Pribyla and his dependents." Consistent
with its basic premise, it then argues that the court thus erred when it interpreted the provision as
obligating Williams Industries, after five years, to extend to the Pribylas "the option of continuing
coverage under the . . . CIGNA policy (i.e., the policy in effect when the Stock Purchase
Agreement was executed), or an equivalent policy if the CIGNA policy is no longer in effect."
      According to Williams Industries, the court's interpretation ignores the plain meaning of the
phrase, "Beasley's Health Insurance Policy in existence," which obviously does not refer to any
specific policy, and improperly rewrites the provision to add a specific reference to "the CIGNA
policy . . . or [its] equivalent." To further illustrate that the court's additions to the contract were
improper and not intended by the parties, Williams Industries points out that, in the second
sentence of the provision, the parties made specific reference to the disability policy that was to
be continued for Eugene Pribyla's benefit—"The Union Mutual Disability Policy currently in
effect for the benefit of Pribyla shall continue in effect with benefits accruing for the benefit of and
paid to Pribyla on the same basis as heretofore until such policy terminates upon Pribyla attaining
the age of 65." Finally, it asserts that the court's interpretation would deprive it of the right,
granted by ERISA, to adjust the nature, level, and type of health benefits for Beasley's employees
as long as Eugene Pribyla lived.



      The Pribylas assert, however, that the court's interpretation is correct because the
interpretation suggested by Williams Industries would render the insurance provision meaningless. 
Because an employer has the right under ERISA to adjust or even eliminate any non-vested
employee welfare benefit, the Pribylas point out that under Williams Industries interpretation, it
could have merely cancelled the CIGNA policy at any time, without replacing it, and thereby
avoided whatever obligation it had under the provision. Such an interpretation, they argue, would
surely render their agreement meaningless.
      Parties are presumed to have intended their agreement to have a legal effect, and if there are
two possible interpretations, a court must adopt the one that will render it effective and reasonable. 
See Portland Gasoline Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W.2d 823, 824
(1951). Therefore, a court must avoid an interpretation that will lead to a ridiculous result. Id. 
These rules require us to reject Williams Industries' suggested interpretation.
      Employee welfare benefits, which by their very nature are non-vested rights, can be decreased
or even eliminated by an employer, without liability under ERISA. Wise v. El Paso Natural Gas
Co., 986 F.2d 929, 934-37 (5th Cir. 1993). Thus, a logical extension of Williams Industries'
interpretation is that it did not, in reality, promise the Pribylas to continue any health benefits at
all. Instead, it could have directed its wholly-owned subsidiary, Beasley, to cancel and not replace
the CIGNA policy, which would have legally negated Williams Industries' obligation to the
Pribylas under the insurance provision. Such an interpretation would lead to the absurd result of
the Pribylas having contracted for nothing at all.
      On the other hand, the court's interpretation recognizes the presumption that the parties
intended their agreement to be effective and, moreover, leads to the only reasonable result the
parties could have intended. Transposing the complete phrase, "in existence for the benefit of
Pribyla and his dependents," so that it immediately follows the word it was intended to modify,
gives a clearer insight into the parties' intent: "[Williams Industries] shall cause the coverage [in
existence for the benefit of Pribyla and his dependents] under Beasley's Health Insurance Policy
to be continued at the expense of Beasley for a period of not less than five years, after which
period Pribyla and his dependents shall have the option of continuing such coverage under such
policy at his or their own expense." See Porter v. Milner, 352 S.W.2d 787, 789 (Tex. Civ.
App.—Fort Worth 1961, no writ) (holding that a court can transpose words or sentences if it will
effectuate the parties' intent without defeating the evident purpose of the agreement). Thus
transposed, the plain language used by the parties show that they clearly intended that Williams
Industries would cause Beasley to continue the coverage in existence for the Pribylas for a period
of five years and then extend them the option of continuing such coverage at their own expense.
      Rather than "in existence" being the key words for unlocking the first sentence's meaning,
as contended by Williams Industries, the real key to resolving the whole dispute over interpretation
is to be found in the term "coverage." Did the parties intend "coverage" to mean any policy that
would cover the Pribylas then, or in the future, or did they intend the term to mean "level of
benefits"? The first alternative is absolutely essential to Williams Industries' analytical construct. 
That meaning cannot be accepted, however, because it leads inevitably to the absurd result that
Williams Industries could escape any obligation under the insurance provision by causing Beasley
to cancel the CIGNA policy and not replace it. This leaves only one logical alternative—the
parties intended the term "coverage" to mean "level of benefits." Words are to be given their
common, ordinary meaning when interpreting a contract, a rule that yields only to the principle
that the parties' intent will control. Fox v. Thoreson, 398 S.W.2d 88, 92 (Tex. 1966). Because
the "level of benefits" has to be determined at a point in time, the court essentially ruled that the
parties intended to measure the level of benefits by the level of benefits in existence for the
Pribylas at the time the stock sale agreement was executed, i.e., the level of benefits under the
CIGNA policy. This is the logical interpretation of their intent from the language used.
      When viewed in this light, the parties' intent becomes crystal clear: "[Williams Industries]
shall cause the [level of benefits in existence for the benefit of Pribyla and his dependents] under
Beasley's [CIGNA] Health Insurance Policy to be continued at the expense of Beasley for a period
of not less than five years, after which period Pribyla and his dependents shall have the option of
continuing such [level of benefits] under such policy at his or their own expense." As can now
be seen, the parties were referring to the continuation of benefits measured by a specific policy
in the first sentence, just as they were in the second sentence of the provision.
      The court ruled that the insurance provision "obligates [Williams Industries and Beasley] after
a period of five years to offer [the Pribylas] the option of continuing [their level of benefits]



under the . . . CIGNA policy (i.e., the policy in effect when the Stock Purchase Agreement was
executed), or an equivalent policy if the CIGNA policy is no longer in effect." This interpretation
is entirely consistent with our view of the parties' intent, taking into consideration that Beasley is
not obligated under the provision. Of necessity, the court had to add the phrase, "or an equivalent
policy if the CIGNA policy is no longer in effect," so as to clarify the parties' intent and to avoid
the absurd result suggested by Williams Industries' interpretation. See Danciger Oil & Refining
Co. v. Powell, 137 Tex. 484, 154 S.W.2d 632, 635 (1941) (holding that a court can add a
provision to a contract if it is necessary to effectuate the parties' intent).
      This leads us into an examination of the second part of the court's interpretation, which deals
with the meaning of the phrase, "at his or their own expense." The court interpreted the phrase
as requiring "[Williams Industries and Beasley] to offer [the Pribylas] the option described above
at the Pribylas' expense which is to be an equal, pro rata share of the company's premium, just
like any other employee or family unit covered by such policy would be or might be required to
pay." This part of the court's interpretation is addressed only tangentially in the parties' briefs.
      The court's interpretation is material, of course, because it was later included in the charge
that asked the jury to determine whether Williams Industries breached the portion of the provision
relating to "continuation of health insurance." After Beasley had paid for the Pribylas' coverage
under the CIGNA policy for five years, the Pribylas were extended the option of continuing their
coverage under the CIGNA policy at a cost of $284,000 a year. This annual cost was calculated
by an actuarial firm, at Williams Industries' request, and represented the incremental cost to
Beasley of having the Pribylas remain as a part of the group covered by the CIGNA policy. In
other words, if everyone except the Pribylas remained covered by the CIGNA group policy, then
Beasley's annual premium would be reduced by $284,000. Williams Industries does not dispute
that the incremental cost of $284,000 was calculated based on Eugene Pribylas' individual claim
history.
      When they used the phrase, "at his or their own expense," did the parties intend for the
Pribylas to pay a premium based on Eugene Pribyla's individual claim history or did they intend
the cost for continuing their coverage to be determined on a COBRA-type basis?


 Just because
the parties did not specify how the expense for continuing the coverage would be calculated does
not mean the provision is ambiguous.
      The parties were contracting with regard to the continuation of the level of benefits measured
by Beasley's group policy. They specified that Beasley would pay the group premium for five
years, after which the Pribylas could continue their level of benefits at their own expense. 
Williams Industries essentially argues the parties intended that the Pribylas would continue to
receive their level of benefits under Beasley's group policy, but at an annual premium calculated
as if they were no longer a member of a group. Considering the subject matter of the provision
and the language used, this suggested interpretation is unreasonable and must therefore be rejected. 
See Portland Gasoline Co., 243 S.W.2d at 824.
      A more reasonable interpretation of their intent is dictated by the phrase, "after which Pribyla
and his dependents shall have the option of continuing such [level of benefits] under such policy
at his or their own expense."


 (Emphasis added). The word "such" is a specific reference to the
level of benefits under a group policy. Thus, the language used clearly indicates the parties
intended that the Pribylas would be given the option of continuing their level of benefits under a
group policy at a pro-rata share of a group rate, not as if they were the only insureds under a
policy. Given the subject of the contract and the language used, that is the only reasonable
interpretation the parties could have intended the word "expense" to have. The court's
interpretation in this regard is entirely consistent with ours.
      In presenting their own interpretations, the parties allude to various circumstances surrounding
the transaction, including Eugene Pribyla's need for good health-care coverage, Beasley's financial
condition, acts carried out by Williams Industries and Beasley while partially performing the
obligations under the provision, and other extraneous facts. Because the insurance provision is
unambiguous and the parties' intent can be determined solely from the language of their
agreement, we have not considered these extraneous circumstances in interpreting the provision. 
Cf. James Stewart & Co. v. Law, 149 Tex. 392, 233 S.W.2d 558, 561 (1950) (holding that court
could consider extraneous circumstances if agreement is ambiguous). 
      Summarizing, we hold that the insurance provision is unambiguous, that the court's
interpretation of its terms and the parties' intent is correct, and that the jury instruction containing
the court's interpretation is also proper. Thus, we overrule points four through six.       
JURY INSTRUCTION ON THE POLICIES
       The court gave the jury the following instruction on the provisions in the CIGNA policy
relating to reimbursement of charges for in-home nursing services:
The Connecticut General [CIGNA] policy covered charges for 24-hour per day in-home
private duty nursing services, with no annual visit limitation and no annual reimbursement
limit, to the extent the services were recommended by a physician, were essential for the
necessary care and treatment of an injury or sickness, and were not for custodial care. The
Connecticut General [CIGNA] policy provided an unlimited lifetime maximum benefit for
covered charges.
Williams Industries attacks the instruction in point seven, contending that the court improperly
interpreted the CIGNA policy because it does not provide unlimited reimbursement for in-home
private-duty nursing expenses but, in fact, limits reimbursement to not more than forty in-home
visits a year. It points out that the term "private duty" does not appear in the CIGNA policy.


 
Even if the court correctly interpreted the CIGNA policy, Williams Industries argues in point eight
that the court should have included additional language regarding coverage under the two
replacement policies for in-home nursing expenses in the portion of the instruction quoted above.
      The CIGNA policy expressly provides in Section 11 (Insuring Provisions) that "Covered
Expenses" means the "expenses incurred by or on behalf of an Employee . . . to the extent that
the services or supplies provided are recommended by a Physician and are essential for the
necessary care and treatment of an Injury or a Sickness." Section 11's list of covered expenses
includes the following in numbered subsections: 
      (1)  charges made by a hospital, on its own behalf, for bed, board, necessary services, and
supplies.
      (5)  charges made by a skilled nursing facility, on its own behalf, for medical care and
treatment, limited to not more than sixty days' confinement in any calendar year.
      (9)  charges made by a nurse, other than a member of the employee's family, for professional
nursing service.
      (11)      charges made by a home health care agency for the following medical services and
supplies provided under the terms of a home health care plan for the person named
in the plan:
                  (a)  part time or intermittent nursing care by or under the supervision of a registered
graduate nurse; and
                  (b)  part time or intermittent services of a home health aide.
(However, the policy excludes any charges for more than forty home health care visits
a year and charges for care or treatment which is not stated in the home health care plan).
Section 12 (General Limitations) provides that no payment will be made for expenses incurred for
"unnecessary care" or "for and in connection with custodial care." Section 9 (Definitions) defines
"nurse," "home health care plan," "home health care agency," "home health aide," and "skilled
nursing facility." 
      Essentially, Williams Industries argues that the CIGNA policy provides coverage for in-home
nursing services only through a home health care agency, which the policy expressly limits to forty
in-home visits a year. A careful reading of the entire policy, however, does not reveal any such
limitation, either express or implied. If Williams Industries' interpretation is correct, the express
listing of "charges made by a nurse . . . for professional nursing service" as covered expenses in
subsection (9) of Section 11 becomes superfluous and meaningless. There would be no need for
subsection (9) because subsection (11) expressly provides that charges made by a home health care
agency for part-time or intermittent nursing services are covered expenses. In other words, why
specify that covered expenses include "charges made by a nurse . . . for professional nursing
service" if, indeed, in-home nursing care can only be delivered by a home health care agency,
within the limitations of subsection (11)? We must interpret the CIGNA policy in a way that gives
effect to all of its provisions. See Liberty Mut. Ins. Co. v. Am. Emp. Ins. Co., 556 S.W.2d 242,
245 (Tex. 1977).
      Williams Industries contends that the court's interpretation of the CIGNA policy as providing
unlimited coverage for in-home nursing expenses is unreasonable because "a person who does not
qualify for a home health care plan, or who, having qualified, then decides to engage the nursing
services from someone who does not meet the qualifications of a home health care agency, by not
qualifying would vastly increase his available coverage, and bypass what would otherwise be
severe policy limitations." If that hypothetical is true, the problem lies in the failure of the policy
to provide otherwise, not with the Pribylas' claim.
      Considering all of its provisions, the CIGNA policy is unambiguous and does not limit in-home nursing services to those delivered by a home health care agency. The court's interpretation
of the CIGNA policy is correct.
      Williams Industries nevertheless argues that, even if the court's interpretation were correct,
the court should have instructed the jury on the coverage available to the Pribylas for in-home
nursing care under the Prudential and Massachusetts Mutual policies, the policies that replaced the
CIGNA policy. The court included the relevant terms of the two replacement policies in other
portions of the instruction. As already noted, the benchmark for determining the scope of
Williams Industries' obligation and for calculating damages is the level of benefits provided by the
CIGNA policy. By its instruction, the court allowed the jury to compare the level of benefits in
all three policies in determining damages. Williams Industries concedes that the two replacement
policies did not provide unlimited reimbursement for in-home nursing expenses but capped
reimbursement at $10,000 a year. Because the instruction as a whole included the relevant terms
of all three policies, the court properly refused to include Williams Industries' request to include
additional language relating to the replacement policies in the portion of the instruction dealing
with the CIGNA policy. We overrule points seven and eight.
DISPOSITION
      Having sustained point three, we reverse the portion of the judgment decreeing a joint and
several judgment against Beasley and render judgment that the Pribylas take nothing against
Beasley. However, we otherwise affirm the judgment against Williams Industries.
 
                                                                               BOB L. THOMAS
                                                                               Chief Justice

Before Chief Justice Thomas,
      Justice Cummings, and
      Justice Vance
Reversed and rendered in part,
      reformed and affirmed in part
Opinion delivered and filed June 14, 1995
Do not publish